UNITED STATES of America, Appellee,

v.

Jose Arturo VICTORIA, Alfredo Maria Garcia–Cuartas, Harold Orejuela, Jimmy Vargas–Toro, Defendants,

Harold Orejuela, Jimmy Vargas–Toro, Defendants–Appellants.

Nos. 88, 111, Dockets 87–1068, 87–1070.

United States Court of Appeals, Second Circuit.

Argued Sept. 15, 1987.

Decided Jan. 12, 1988.

Robert L. Herbst, New York City, for appellant Orejuela.

Justin Levine, New York City, for appellant Vargas–Toro.

Julie Copeland, Asst. U.S. Atty., New York City (Andrew J. Maloney, U.S. Atty. for the Eastern District of New York, Brooklyn, N.Y., of counsel) for appellee.

Before CARDAMONE, WINTER and MINER, Circuit Judges.

MINER, Circuit Judge:

Appellants, Harold Orejuela and Jimmy Vargas–Toro, appeal from judgments of conviction entered in the United States District Court for the Eastern District of New York, convicting them, after a jury trial, of conspiracy to manufacture, distribute and possess with intent to distribute cocaine, in violation of 21 U.S.C. §§ 846 and 841(b)(1)(A)(ii) (1982 & Supp. III 1985). The conspiracy charge was alleged in the first count of a three-count indictment which charged appellants and two others with additional counts of manufacturing cocaine (Count Two) and possessing cocaine with intent to distribute it (Count Three), in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A)(ii). Appellants were acquitted on the two substantive counts, and each was sentenced to a term of imprisonment of eight years on the conspiracy count. Their co-defendants, Jose Arturo Victoria and Alfredo Garcia–Cuartas, entered pleas of guilty to the manufacturing count in satisfaction of all charges in the indictment. Because the trial judge's questioning of appellants before the jury exceeded proper bounds by conveying the distinct impression that he considered their testimony incredible, appellants were deprived of a fair trial. We therefore reverse and remand for a new trial as to both appellants.

## BACKGROUND

During a surveillance conducted on September 25, 1986, agents of the Drug Enforcement Administration ("DEA") observed the arrival of three automobiles at the Kern Chemical Plant, Mount Vernon, New York. The agents observed four men, including appellants Orejuela and Vargas–Toro, emerge from the automobiles, one of which was marked "Denise's Car Service," the name of Orejuela's employer. The four men transferred a number of boxes, later determined to contain ether, from the plant's loading dock to the vehicles, which then were driven to an apartment building on West Seventh Street in Brooklyn where Victoria maintained an apartment. Orejuela and Vargas–Toro arrived together in the Car Service vehicle, a green Chevrolet. Orejuela remained outside while the others transferred some of the boxes from the Chevrolet into the building. As soon as the boxes were unloaded, Orejuela drove away.

Later the same day, Garcia–Cuartas and Vargas–Toro drove one of the other automobiles from the West Seventh Street building to their residence, a two-story house on Fourth Avenue in Brooklyn. Victoria arrived in the third automobile, and all three men participated in unloading boxes of ether from both vehicles and carrying them into the house. Upon completion of this transfer, Victoria left and the other two remained in their living quarters. During a surveillance of the Fourth Avenue residence on October 1, 1986, DEA agents observed Victoria, Vargas–Toro and Orejuela transfer some boxes from the residence into two automobiles. The boxes then were driven to the West Seventh Street apartment building, the place where the contents of Orejuela's automobile had been unloaded on September 25. On this occasion, Orejuela was observed carrying two boxes into the building.

When the DEA agents entered the courtyard of the West Seventh Street premises in the early evening on October 1, they

detected a strong odor of ether. Moving from floor to floor in the building in order to pinpoint the source of the ether, a chemical known for its use in the processing of cocaine base, the agents noted the smell of disinfectant emanating from the sixth floor apartment occupied by Victoria. They then went to the roof of the building above the apartment and were able to smell ether as well as disinfectant. Apparently, disinfectant was used in an effort to mask the ether odor. Nevertheless, the agents continued to smell the ether from the roof above the apartment, from the hallway outside the apartment and from the street as they maintained surveillance throughout the evening and into the next morning.

In the afternoon of October 2, the DEA agents entered Victoria's apartment under the authority of a search warrant. The apartment consisted of a kitchen, living room, two bedrooms and a bathroom. The agents found eight kilograms of cocaine under the kitchen sink. They also found, at various locations in the apartment, material and equipment clearly indicating that the apartment had been used as a clandestine cocaine manufacturing facility. The material and equipment included plastic containers, acetone, hydrochloric acid, beepers, scales, filtering materials, funnels, pails and a drying apparatus. Among the items discovered was a large quantity of ether. Although a cloth had been saturated with disinfectant for the purpose of covering the odor of the chemicals used in the process, vapors from the manufacturing operations permeated the entire apartment. Orejuela and Vargas–Toro were present in the apartment along with Victoria and Garcia–Cuartas when the agents entered the apartment. All four men were in their underwear at the time, according to a government witness, and all were arrested. The agents also executed a search warrant at the Fourth Avenue residence shared by Vargas–Toro and Garcia–Cuartas. There they located sixteen gallons of ether and sixteen gallons of acetone packed in boxes. The cans of ether were similar to those found at the West Seventh Street apartment.

Orejuela and Vargas–Toro both testified at the trial. Prior to the events giving rise to his prosecution in this case, Vargas–Toro, a national of Colombia, had been released on bail following his arrest for entering the United States illegally. He testified that Garcia–Cuartas, his step-father, enlisted him to assist in picking up the boxes at the chemical plant on September 25, but that he was not aware of the contents of the boxes. He said that he then drove with Orejuela to Victoria's apartment, and that he transferred the boxes from Orejuela's car to the apartment. He also said that he carried boxes later that day into the residence he shared with his step-father. On October 1, Vargas–Toro assisted in moving to Victoria's apartment the boxes located at his residence. He testified that he remained in the apartment throughout the evening and eventually went to sleep there in a bed he shared with Orejuela. During the course of the evening, Vargas–Toro noticed a strong odor in the apartment. When Orejuela inquired about the odor, Victoria said that it was ether. When Vargas–Toro awakened the next morning, he washed up, entered the living room and began to watch television. He was wearing short pants, and, at that point, noticed pails and buckets in the living room. He was joined in the living room by Orejuela, who had just taken a bath. The "raid" occurred shortly thereafter. Vargas–Toro denied any knowledge of the presence of cocaine or the use of the apartment as a processing laboratory.

During the course of the foregoing testimony, given on direct examination, the trial court interrupted to inquire of Vargas–Toro regarding his current immigration bail status, his failure to report to Immigration, whether he had observed Orejuela loading boxes at the chemical plant and whether he knew what a beeper was used for. The exchange between the Court and Vargas–Toro included the following:

Q: By the way, do you know why Mr. Orejuela was staying in that apartment that night?

A: No. I sincerely don't. I didn't, I never said, you know, I just saw him two or three times.

THE COURT: Wait a minute. He was in the living room with this gentleman?

THE WITNESS: The next morning.

THE COURT: Ask him if he was in the living room with him.

THE WITNESS: Yes, after he took his bath, yes, he came into the living room.

THE COURT: While they were in there watching TV did you turn to him and say, "What are you staying here for"?

THE WITNESS: No, no, no.

Q. It's not your business, is it?

MISS COPELAND: Objection, your Honor.

THE WITNESS: No, never.

THE COURT: And you were with the man for a few days?

THE WITNESS: Or just scarcely from the night before.

THE COURT: Yes. You never asked him why he was staying.

THE WITNESS: No, because he's a very good friend of Mr. Victoria's.

THE COURT: Did he ask him if he would like to go out, drive his cab and make some money?

THE WITNESS: No, no, I knew that he worked taxis. I never asked him how much he earned.

THE COURT: Did he tell him, "I think I'll go out and drive a cab and make a few dollars"?

THE WITNESS: No, he didn't say anything.

THE COURT: And he didn't say why he was staying?

THE WITNESS: No, the next day he got up and he called his wife.

MR. HERBST: I have a motion. I would like to be heard at the side bar.

The motion made by Mr. Herbst was for a mistrial predicated on the prejudicial nature of the Court's questions. It was not heard until the conclusion of Vargas–Toro's direct testimony, at which time it was denied.

Orejuela testified that he had been acquainted with Victoria since they attended high school together in Colombia. On September 25, at Victoria's request, he drove his employer's automobile to the chemical plant in the Bronx and transported boxes from there to Victoria's apartment. Orejuela testified that he thought the boxes might contain paint, since he knew that Victoria was employed as a painter. He received $35 for the services he provided on that day. On October 1, Victoria again asked him for transportation assistance, and he used his own automobile on that day to transfer two boxes from the Fourth Avenue residence to Victoria's apartment. Orejuela had stayed in the apartment in the past and remained there overnight on October 1. During the course of the evening, he noticed an odor emanating from one of the rooms and, after inquiry, was told by Victoria that it was ether. He did not inquire further. Orejuela testified that he arose at about 11:30 A.M. the next day, took a bath and then joined Victoria, Garcia–Cuartas and Vargas–Toro in the living room of the apartment. The DEA agents entered as he prepared to leave. He denied that he observed any cocaine or participated in its manufacture. Orejuela's testimony concluded with the following exchange:

Q: Mr. Orejuela, did you know that ether was a dangerous chemical?

A. No, I didn't know.

MR. HERBST: Nothing further.

THE COURT: Anything?

MS. COPELAND: Nothing further, Your Honor.

THE COURT: Ask him if he knows what cocaine is.

THE DEFENDANT: I have heard about it on television and I have seen it in the newspapers.

THE COURT: Does he know what it is?

THE DEFENDANT: I know that it is a drug. It is forbidden. It is very harmful for health. It is very harmful to society.

THE COURT: Tell him the night of the first and the second when he was in the apartment he saw those pails which are right here in court—

MR. HERBST: Objection, Your Honor. That was not the testimony, it was in the morning.

THE COURT: It was in the morning he saw them, in the morning you saw those pails, right?

THE DEFENDANT: Yes, Your Honor.

THE COURT: You had been in that apartment many times before?

THE DEFENDANT: Yes, Your Honor.

THE COURT: When was the first time that you saw those pails?

THE DEFENDANT: On October the 2nd when they were there.

THE COURT: And the occasions you were there before you never had seen them?

THE DEFENDANT: No, I never saw them, Your Honor. Maybe they were there but I never saw any.

THE COURT: I think when the agent was here in court, when the agent testified he said that when he came in to the apartment that all four of the men in there were in their underwear. Did you hear the agent say that?

THE DEFENDANT: I don't remember, Your Honor.

THE COURT: You don't remember. Well then I will ask you the question, when the agents came in, were all four of you in your underwear?

THE DEFENDANT: I was wearing clothes, Your Honor.

THE COURT: You were. What about the other three?

THE DEFENDANT: The other three, they had shorts on.

THE COURT: They had their underwear on?

THE DEFENDANT: They were wearing shorts. I don't know whether it is underwear but it was short pants.

THE COURT: He was the only one wearing clothes and the other three were wearing shorts?

THE DEFENDANT: Yes, because I was getting ready to go.

THE COURT: So, the agent was wrong?

MR. HERBST: Your Honor, I would object.

THE COURT: That is the issue.

THE DEFENDANT: I don't know, Your Honor.

THE COURT: I see. All right. Would you like to ask him anything?

MR. HERBST: No, Your Honor.

THE COURT: Would you like to ask him anything?

MS. COPELAND: Nothing further, Your Honor.

THE COURT: All right. The witness is excused.

## DISCUSSION

 The trial court is entitled to interrogate witnesses in the discharge of its responsibility to insure that the issues are clearly presented to the jury. Fed.R.Evid. 614(b); *United States v. DiTommaso*, 817 F.2d 201, 221 (2d Cir.1987). The court must exercise caution to maintain an appearance of impartiality, *United States v. Vega*, 589 F.2d 1147, 1153 (2d Cir.1978), but questions designed to elucidate testimony are appropriate where they do not "betray the court's belief as to the defendant's guilt or innocence." *DiTommaso*, 817 F.2d at 221. We have held that "the questioning of witnesses by a trial judge, if for a proper purpose such as clarifying ambiguities, correcting misstatements, or obtaining information needed to make rulings, is well within" the court's "active responsibility to insure that issues clearly are presented to the jury." *United States v. Pisani*, 773 F.2d 397, 403 (2d Cir.1985).

 A review of the questions asked of the appellants by the trial judge reveals interrogation in the nature of cross-examination challenging the credibility of the witnesses. Clearly implied in the questions is the Court's skepticism regarding the appellants' claim that they lacked any knowledge of the cocaine manufacturing operations. Even before the prosecutor's cross-examination of Vargas–Toro, the trial judge intervened with questions he later said were designed to test the credibility of the witness. In his questioning, the judge challenged Vargas–Toro's testimony that he did not know why Orejuela stayed overnight in Victoria's apartment. The Court twice asked if Vargas–Toro inquired of Orejuela as to why he had stayed, and on another occasion asked if Orejuela told

Vargas–Toro why he had stayed. The Court expressed its skepticism of Vargas–Toro's negative answers in its question: "And you were with the man for a few days?" Actually, the evidence established that the men were together only overnight at Victoria's apartment. The Court also raised doubts as to the credibility of Vargas–Toro by questioning him regarding his failure to ask Orejuela why the latter was not driving his cab. It also challenged his credibility in its questions relating to his immigration status, whether he observed Orejuela loading boxes at the chemical plant and whether he was familiar with beepers.

Since Fed.R.Evid. 607 provides that "any party" may attack the credibility of a witness, it is at least open to question whether impeachment is a proper function of the trial judge. In any event, it seems to be clear error for a trial judge to ask questions bearing on the credibility of a defendant-witness prior to the completion of direct examination. There can be no doubt that the Court's interruption of Vargas–Toro did not have as its purpose the clarification of ambiguities, the correction of misstatements or the development of information used to make rulings. *United States v. Pisani*, 773 F.2d at 403. The sole purpose of the interrogation, as conceded by the trial court, was to challenge the credibility of the witness. Unfortunately, it also served to convey to the jury here the judge's opinion that the witness was not worthy of belief. When such doubt is injected by the court in a case where credibility of a defendant-witness is a key issue, there has been a deprivation of a fair jury trial. *See United States v. Fernandez*, 480 F.2d 726, 737–38 (2d Cir.1973); *United States v. Nazzaro*, 472 F.2d 302, 307–13 (2d Cir.1973).

The foregoing also applies to the Court's even more egregious interrogation of Orejuela. When Orejuela's cross-examination was concluded, the Court attacked his credibility by questions emphasizing his awareness of the nature of cocaine and his failure to observe the pails used in the cocaine manufacturing process despite having been in the apartment on several previous occasions. The Court then proceeded with a number of questions designed to show the inconsistency between the testimony of a DEA agent and the testimony of Orejuela regarding the attire of the four men in Victoria's apartment when the search warrant was executed. The Agent said that the four men were in their underwear, while Orejuela said that he was fully clothed and that the others were wearing "short pants." The Court first repeated the Agent's testimony and then called for Orejuela to repeat his testimony on the subject. After eliciting the discrepancy, the Court said: "So, the agent was wrong?" Following objection, the Court said: "That is the issue," and Orejuela responded to the question: "I don't know, your Honor."

Because "[d]eterminations of credibility are for the jury, ... not for witnesses," we have held that "[p]rosecutorial cross-examination which compels a defendant to state that law enforcement officers lied in their testimony is improper." *United States v. Richter*, 826 F.2d 206, 208 (2d Cir.1987) (citations omitted). It is every bit as improper, and probably more so, for a trial judge to require a witness, especially a defendant, to characterize the testimony of a government agent as right or wrong. This error, combined with the improper interrogation of Orejuela challenging his credibility in regard to his knowledge of cocaine and the pails in the apartment, served to deprive Orejuela of a fair jury trial. As to him also, the Court injected, through questioning, its opinion that he was not worthy of belief.

## CONCLUSION

Reversed and remanded for a new trial.