UNITED STATES of America, Appellee,

v.

Paul MAZZILLI, Defendant–Appellant.

No. 744, Docket 87–1438.

United States Court of Appeals,
Second Circuit.

Argued Feb. 2, 1988.

Decided June 6, 1988.

Roger Bennet Adler, New York City, for defendant-appellant.

Kevin O'Regan, Asst. U.S. Atty. (Andrew J. Maloney, U.S. Atty. for the E.D. New York, John Gleeson, Asst. U.S. Atty., of counsel), for appellee.

Before LUMBARD, WINTER and ALTIMARI, Circuit Judges.

ALTIMARI, Circuit Judge:

Defendant-appellant Paul Mazzilli appeals from a judgment of conviction entered in the United States District Court for the Eastern District of New York. After a three day jury trial, Mazzilli was convicted of receiving stolen property in violation of 18 U.S.C. § 2315, possession of stolen property in violation of 18 U.S.C. § 659, and conspiracy to possess and distribute stolen property in violation of 18 U.S.C. § 371. Thereafter, he was sentenced to concurrent five-year terms of im-

prisonment on each count, of which four and one-half years were suspended, concurrent five-year terms of probation and was ordered to pay an aggregate $25,000 fine, a special assessment of $50.00 on each count, and to make restitution. Execution of the sentence was stayed pending appeal.

On appeal, Mazzilli presents several arguments in support of his contention that he was denied a fair trial. In particular, Mazzilli claims that the district court's intensive questioning while he testified caused the jury to conclude that the court disbelieved his account of the facts and swayed the jury's views during its deliberations.[1] In addition, Mazzilli points out that the court inquired into prejudicial, collateral matters during its questioning of him and he argues that, because the government's attorney would have been prohibited from inquiring into these matters, the district court erred in doing so. Because we conclude that the district court's intensive questioning of Mazzilli denied him a fair trial, we reverse.

## BACKGROUND

The instant case arose out of the theft of a shipment of various electronic products and electronic children's games. On November 7, 1986, two tractor-trailers containing 500 Soundesign television sets, 3,408 Soundesign telephones and 1,428 Entertech Photon Warrior games were stolen from a truck yard located in New Brunswick, New Jersey. Shortly thereafter, the stolen merchandise surfaced in Brooklyn, New York. On November 19, 1986, FBI agents who were investigating the theft seized 284 of the stolen televisions and 411 of the stolen games from the home of defendant-appellant Paul Mazzilli. On the same day, government agents also seized 3,188 of the stolen telephones from Albert Baker, who owned a Brooklyn, New York wholesale video equipment outlet. On November 24, 1986, Mazzilli was arrested and charged with possession of the stolen merchandise.

At trial, Baker, who cooperated with the government in Mazzilli's prosecution, testified that on November 12, 1986 he was approached by an acquaintance named Joey who offered to sell him Photon Warrior games. The games normally sell for between $59 and $69 per game, but Joey offered them to Baker for between $35 and $45 each. Joey accounted for the low price by explaining that, although the games had been ordered for a North Carolina store, they were part of an "overage of a shipment" and had been "refused." Baker bought 800 games for a total cost of $30,000. Baker explained, however, that Joey wanted to be paid in cash and would not provide him with an invoice or bill of lading for the goods. Although Baker initially did not suspect that the merchandise he purchased from Joey was stolen, the cash terms and the lack of invoices led him to believe that the games were stolen.

Subsequently, on November 18, having sold the first shipment of games, Baker sought to buy more, but Joey did not have any to sell. Joey then asked Baker to "store" some Soundesign telephones for ten days as a "favor," and stated that "[i]f you can't sell them, I'll take them back from you and I'll give you a dollar to store and to handle each one." The next day two FBI agents visited Baker's store and seized the telephones. The agents then asked Baker whether he had information regarding Soundesign television sets. Baker told the agents that "they [the television sets] were on the streets and ... [that] there [was] other stuff on the streets." He explained that he believed that this merchandise was stolen. He also told the agents that Mazzilli had offered to sell him some television sets but that he was not interested.

---

1. We observe that defendant did not raise an objection at trial to the questions posed by the district court, and apparently sought no curative instructions. We also note that the government does not argue here that Mazzilli's challenge was not properly preserved for appeal. Because the government has failed to raise this issue on appeal and because we conclude that the district court's conduct was such that it prejudiced Mazzilli's fair trial rights, we conclude that it is appropriate to address the merits of this claim.

In addition to Baker's testimony, the government's case against Mazzilli included the testimony of the two FBI agents, Andy Conlin and Colleen Nichols, who had seized the Soundesign television sets from Mazzilli's home. Agent Nichols explained that after she and Agent Conlin had identified themselves and had explained to Mazzilli that they were looking for merchandise that had been stolen, Mazzilli directed them to his basement where he had stored the television sets. Agent Nichols testified that Mazzilli then approached her and sought to make a "deal" with the agents.

To rebut the government's case, Mazzilli testified on his own behalf. Mazzilli described himself as an inexperienced businessman who ran a small videocassette rental store in Brooklyn, New York. He stated that he was on a first-name basis with most of his customers, who largely were from the same neighborhood. Mazzilli explained that Joey, with whom he was acquainted, offered to sell him some Soundesign television sets, providing that he could return any unsold televisions in 30 days time and pay for only those sets which he had actually sold. He purchased 325 Soundesign television sets from Joey at $62 each and he resold them for $129, almost invariably for cash and without issuing a receipt. To counter the inference that, when he received the discounted merchandise, he should have known it was stolen, Mazzilli explained that, due to his inexperience, he simply thought he was getting a good deal on "overage" merchandise, which is commonly sold at deep discount throughout New York City. Mazzilli also challenged Agent Nichols' account of the conversation in which he allegedly sought a deal.

During the course of Mazzilli's testimony, the district court interrupted on several occasions to ask questions. At one point during cross-examination, while the government's attorney was attempting to impeach Mazzilli's testimony regarding his lack of knowledge that the goods were stolen, the district court intervened to ask questions regarding his transaction with Joey:

THE COURT: Let me see if I understand, on these terms. They were net 30 or open. So that you either paid him within 30 days or you could return the unsold balance and just pay for what you sold?

[MAZZILLI]: Right.

THE COURT: All of these items?

[MAZZILLI]: Yes.

THE COURT: And there-he didn't require you to put any money down?

[MAZZILLI]: No.

THE COURT: Nothing?

[MAZZILLI]: No.

THE COURT: He just brought them and put them in your cellar?

[MAZZILLI]: Yes.

THE COURT: Is that the way the invoice reads from Global?

[MAZZILLI]: I don't remember. Probably says net on it. Probably net 30.

THE COURT: Didn't say anything open?

[MAZZILLI]: I don't know. I'm pretty sure it said net 30.

THE COURT: It didn't say anything about open and right to return?

[MAZZILLI]: No. That's normal.

THE COURT: That's normal? That's the way all your customers do it?

[MAZZILLI]: All my distributors, sure. If I take a large delivery and I can't sell them, I can return them. Otherwise I won't take—

THE COURT: It doesn't say anything on the Global, though?

[MAZZILLI]: Doesn't say it's net 30?

THE COURT: Doesn't say anything about right to return.

[MAZZILLI]: That's normal. Normal on net 30, as long as I have been in business. I have always been able to return what was unsold.

After this exchange, the government's attorney proceeded with his cross-examination, asking a few more questions, when the district court again invervened:

THE COURT: You have a record of these sales that you made of 41 TVs and 39 toys?

[MAZZILLI]: The fact that they were sold, yes.

THE COURT: No. You have a record of the individual sales that you made?

[MAZZILLI]: Sure.

THE COURT: His question is, did you search for the records of those sales?

[MAZZILLI]: No. Have I searched for them, no.

THE COURT: No.

[AUSA]: So you haven't gone through Precision Video's records to look for records about any sales you made of these TVs or toys, is that right?

[MAZZILLI]: Just the one with the Master Charge.

THE COURT: Is that Global invoice read to—it is addressed to you? Paul Precision?

[MAZZILLI]: I don't remember. I don't have it here.

\*      \*      \*      \*      \*      \*

THE COURT: Did they call you up and ask you to return this merchandise after the 30 days were up?

[MAZZILLI]: Someone did contact me in reference to the thing after I was arrested.

THE COURT: They did?

[MAZZILLI]: Yes.

THE COURT: You got his name?

[MAZZILLI]: Yes. His name is Joe.

THE COURT: Joe?

[MAZZILLI]: Joe.

THE COURT: The same Joey?

[MAZZILLI]: At this time the same Joey. But I told him I couldn't say anything about it because of my attorney's request.

THE COURT: You didn't say to Joey, listen, those are hot goods?

[MAZZILLI]: Joey never said that.

THE COURT: You didn't say that to Joey?

[MAZZILLI]: No.

THE COURT: You didn't?

[MAZZILLI]: My attorney advised me not to talk about the case.

THE COURT: Wait a minute. This guy had just sold you and got you in all this trouble for some $30,000 worth of hot goods and you never said, hey listen, that stuff you sold—you sold to me was hot?

[MAZZILLI]: I never said that to him.

THE COURT: He called you up?

[MAZZILLI]: Yes.

THE COURT: Did you ask him where he was?

[MAZZILLI]: No.

THE COURT: You didn't ask him for his last name either at that point?

[MAZZILLI]: No.

THE COURT: Or his address?

[MAZZILLI]: No.

On other occasions, the district court questioned Mazzilli on the fact that he had sold all the television sets for cash and about various inadequacies in the invoices he received for the merchandise. In addition, the district court returned to the point made earlier regarding the fact that Mazzilli did not immediately contact Joey after the FBI agents seized the television sets:

THE COURT: When you found out from the agent these were stolen and eight days later I think you told us you found this invoice, did you attempt to locate the location of where Global was?

[MAZZILLI]: No, I didn't. I called my attorney.

THE COURT: You never looked up in a phone book or anything like that?

[MAZZILLI]: No.

THE COURT: No. When Joey called you, you didn't say where is Global located?

[MAZZILLI]: No.

THE COURT: Okay.

The court in its questioning returned to Mazzilli's failure to contact Joey during three other exchanges, each subsequent colloquy essentially repeating the same line of inquiry.

The court did not limit its intervention to crossexamination. While Mazzilli testified on direct examination and after he disputed Agent Nichols' account of the circumstances surrounding his alleged offer to make a deal, the district court interrupted:

THE COURT: Wait a minute. You heard—you saw the demonstration that was put on here when Ms. Nichols described what happened where she was

standing right alongside of him. As you recollect it, as I understand it, he was—

[MAZZILLI]: He was not next to her.

THE COURT: She made that up?

[MAZZILLI]: That is correct.

THE COURT: All right.

[MAZZILLI]: Or she was mistaken.

THE COURT: Just mistaken?

[MAZZILLI]: One or the other.

## DISCUSSION

Mazzilli contends on this appeal that the district court's conduct denied him a fair trial. He asserts that because the sole issue at trial was whether he knew that the merchandise he possessed was stolen, the jury's evaluation of his credibility was critical to his defense that he lacked such knowledge. He argues that the court's intensive questioning while he testified communicated to the jury its impression that his testimony was unworthy of belief. In addition, Mazzilli argues that the district court's instruction—telling the jury not to be swayed by the court's questions—did not mitigate the adverse impact of its active intervention. We agree.

A district court's role at the trial "is not restricted to that of a mere umpire or referee," *United States v. DiTommaso,* 817 F.2d 201, 221 (2d Cir.1987); "a trial judge need not sit like 'a bump on a log' throughout the trial." *United States v. Pisani,* 773 F.2d 397, 403 (2d Cir.1985). In recognition of the fact that the district court bears the responsibility for insuring that the facts in each case are presented to the jury in a clear and straightforward manner, we have consistently held that " 'the questioning of witnesses by a trial judge, if for a proper purpose such as clarifying ambiguities, correcting misstatements, or obtaining information needed to make rulings, is well within' the court's 'active responsibility to insure that issues clearly are presented to the jury.' " *United States v. Victoria,* 837 F.2d 50, 54 (2d Cir.1988) (quoting *Pisani,* 773 F.2d at 403); *see United States v. Nazzaro,* 472 F.2d 302, 313 (2d Cir.1973).

Fundamental to the right to a fair trial, however, is that the court's responsibility to assist the jury in understanding the evidence should not be so zealously pursued as to give the impression to the jury that the judge believes one version of the evidence and disbelieves or doubts another. *See Victoria,* 837 F.2d at 55, *Nazzaro,* 472 F.2d at 303. While it is unquestionably proper for the government to seek to impeach a defendant's testimony, this is not a proper function of the court for it must at all times maintain the appearance of impartiality and detachment. *See Nazzaro,* 472 F.2d at 313.

In the instant case, Mazzilli relied almost exclusively on his own testimony at trial to rebut the government's case. The jury's evaluation of Mazzilli's credibility therefore was critical to its determination of his guilt or innocence. Indeed, because the government lacked direct evidence to tie Mazzilli to the thefts, and because Mazzilli had an explanation for nearly every piece of circumstantial evidence offered against him, the government necessarily had to discredit Mazzilli's testimony through impeachment. Where, as here, the defendant's credibility is crucial to his defense, a jury's impression that the court disbelieves his testimony surely affects its deliberations. The jury cannot be regarded as having freely come to its own conclusions about the defendant's credibility when the court has already indicated, directly or indirectly, that it disbelieves his testimony.

The record demonstrates that the district court played an overly intrusive role during Mazzilli's testimony. Through its questions, the district court imparted a message of skepticism to the jury and seemingly invited the jury to infer that Mazzilli possessed knowledge that the merchandise was stolen. It was up to the government to establish Mazzilli's knowledge beyond a reasonable doubt and not to be assisted by the court's questioning. The court's questioning left the jury with the indelible impression that the court did not believe Mazzilli's account of the facts. This was error.

As a separate matter, we observe that the district court asked Mazzilli to

characterize Agent Nichols' testimony. We have held that it is improper for a court to require a witness to characterize the testimony of a government agent as a lie. *See Victoria,* 837 F.2d at 55; *cf. United States v. Richter,* 826 F.2d 206, 208 (2d Cir.1987). Although this alone would not necessarily merit reversal, because the determination of whether to believe the agent's testimony or Mazzilli's is left to the jury alone, we find that the court's questions in this regard were also improper. *See Victoria,* 837 F.2d at 55.

We note that the district court instructed the jury not to infer anything from its questions posed to Mazzilli. We nevertheless conclude that on this record the court's instruction could not have adequately mitigated the harm caused by its vigorous and extensive questioning.

## CONCLUSION

It is always difficult to evaluate a claim that specific conduct of the district court denied a defendant of a fair trial. In these cases, our review can only be guided by the cold black and white of the printed record. From the record, it is difficult to gleen tone of voice, whether sarcastic or neutral, facial expression, whether reflecting disbelief or sober thoughtfulness, or physical demeanor, whether self-contained or expressing opinion and emotion. Therefore, it is only after an examination of the entire record that we can come to a conclusion about the conduct of the district court.

Having conducted such a review, we conclude that the district court exceeded its proper bounds by assuming the role of advocate to undermine Mazzilli's credibility. We find, therefore, that the court's prejudicial questioning and its compelling Mazzilli to characterize the agent's testimony resulted in denying him a fair trial. Accordingly, we reverse the judgment of conviction entered against Mazzilli and remand for a new trial.