**UNITED STATES of America, Appellant,**

v.

**Carluin SANCHEZ, Defendant–Appellee.**

**No. 1140, Docket 91–1723.**

United States Court of Appeals,
Second Circuit.

Argued April 3, 1992.

Decided July 20, 1992.

Otto G. Obermaier, U.S. Atty., New York City (Sharon L. Davies, Helen Gredd and Daniel C. Richman, Asst. U.S. Attys., New York City, of counsel), for appellant.

David Cooper, New York City, for defendant-appellee.

Before PIERCE, MINER and McLAUGHLIN, Circuit Judges.

MINER, Circuit Judge:

Appellant United States of America appeals from an order granting a new trial, Fed.R.Crim.P. 33, entered in the United States District Court for the Southern District of New York (Martin, J.). The order was entered following the rendition of a jury verdict convicting defendant-appellee Carluin Sanchez ("Carluin") of conspiracy to distribute and possess with intent to distribute heroin, in violation of 21 U.S.C. § 846, and possession of heroin with intent to distribute it, in violation of 21 U.S.C. §§ 812, 841(a)(1) and 841(b)(1)(B). Principally based upon its determination that perjured testimony was given by three police officers at trial, the district court set the verdict aside and ordered a new trial "in the interest of justice." Fed.R.Crim.P. 33.

As it did in the district court, the government argues on appeal that the trial judge was without authority to vacate the guilty verdict on the basis of a disagreement with the jury's assessment of witness credibility. The government contends that credibility issues must be resolved by the jury alone. Carluin argues on appeal, as he did below, that the determination of the trial judge that the three witnesses testified falsely formed a sufficient basis for the trial judge to exercise his discretion to grant a new trial in this case. Carluin contends that district court judges are not bound by credibility decisions made by a jury in circum-

stances such as those revealed here. Carluin also argues on appeal, although the district court specifically declined to reach the issue, that the government knowingly used perjured testimony and that the verdict should have been set aside for that reason alone.

This controversy over the proper interpretation and application of Rule 33 brings to mind the dispute involving the "blind men of Indostan," who were unable to fully agree on the correct description of an elephant:

And so these men of Indostan
  Disputed loud and long,
Each in his own opinion
  Exceeding stiff and strong,
Though each was partly in the right,
  And all were in the wrong![1]

We think that both parties here, like the men of Indostan, are wrong in their contentions, although each is partially "in the right." However that may be, our own interpretation of Rule 33, as applied to this case, dictates reversal of the order of the district court.

## BACKGROUND

It appears to be uncontroverted that Hector "Tito" Sanchez, brother of Carluin, was a member of the heroin distribution organization that operated under the direction of one Steven Ramos. The heroin was sold under the brand name "Pure Energy" from a house on Frisby Avenue in the Bronx, where Tito lived with his girlfriend. Apparently, Tito used the house as a "mill," where pure heroin was diluted and packaged for street distribution. In the summer of 1990 Carluin moved in with his brother. Later in the summer, the brothers moved to Beach Avenue in the Bronx and, in late September or early October, 1990, to an apartment at 417 Thieriot Avenue in the same Borough.

Carlos Trinidad was a major buyer of "Pure Energy" heroin, which he purchased from Tito for resale. He testified that he purchased thousands of dollars worth of the cutting mill product on an almost daily basis. When he called at the Thieriot Avenue apartment to make his purchases on several occasions, he observed Carluin take boxes of heroin from closets in the apartment to give to him. According to Trinidad, Carluin supplied him directly during the nine-day period in mid-October of 1990 when Tito, Steven Ramos and others were on a trip to Puerto Rico. During that time, Carluin received substantial amounts of money from Carlos Trinidad in return for the delivery of substantial quantities of drugs.

Trinidad testified that the "mill" was operated out of the Sanchez brothers' apartment at Thieriot Avenue during the month of November, 1990. He said that when he came to the apartment on one occasion, he saw an assembly line operation in progress. One millworker spooned heroin into glassine envelopes and two others sealed the envelopes with scotch tape. All wore masks to avoid inhaling the heroin. According to Trinidad, Carluin was lying on the floor at the time of his visit, engaged in bundling the glassine envelopes into groups of ten with rubber bands. At the end of November, the mill was moved to an apartment at 380 Balcom Avenue, apparently because the activities at the Thieriot Avenue building were arousing the suspicions of the landlord, who was a New York City police officer. Trinidad frequently observed the millworkers, including Carluin, arrive for work at the Balcom Avenue location. He was able to make those observations because he lived in the neighborhood.

Despite the change in mill location, the Sanchez brothers maintained the Thieriot Avenue apartment, from which they continued to transact their heroin business. Discussions between Tito and Steven Ramos regarding deliveries to the apartment were revealed in intercepted telephone calls. In one call, Tito told Ramos that Carluin, referred to in the call by his nickname, "Piro," had left the apartment to "go over there" following a call from Davila, the head of mill operations. In another, Tito notified Ramos that he needed "Spanky," a member of the gang, to come over the

---

1.  John Godfrey Saxe, "The Blind Men and the     Elephant."

following morning, when he was at home, or to come over that night, if "Piro" was there.

The investigation of the Steven Ramos drug conspiracy led to the issuance of more than forty arrest warrants and twenty search warrants. These included the warrants that were issued for the arrest of Tito Sanchez, for a search of the second floor apartment he occupied at 417 Thieriot Avenue and for a search of the basement in the same building. It is undisputed that twelve to fourteen law enforcement officers arrived at the Thieriot Avenue location at about 5 a.m. on January 9, 1991 to execute the warrants; that the officers were divided into three teams: one to secure the outside of the building, one to enter the basement, and one, led by Sergeant Richard Bushrod of the New York City Police Department, to enter the second floor apartment where Tito resided; and that the officers rammed the outside door of the building to gain entrance.

Sergeant Bushrod testified that he proceeded up the stairs to the second floor apartment and knocked on the apartment door immediately after entering the building. Tito Sanchez opened the door, saw Bushrod, who identified himself as a police officer, and immediately attempted to close the door. A pushing contest ensued, and Bushrod placed his foot against the door to hold it open and called for the battering ram that had been used on the outside door. While the apartment door was partially open, Bushrod saw a person run across the room inside. He then heard a toilet flushing within the apartment. Bushrod did not recall whether the ram was used to force the door open, but he did recall that he called for it. He said that he pushed Tito against the wall after he gained entrance and that Tito then was handcuffed by another officer. Bushrod proceeded to the one bedroom in the apartment and then returned to the living room, where he had entered initially. In the living room, he first observed Carluin, who was being detained there. Bushrod next proceeded to the bathroom, where another officer was removing bundles of glassine envelopes that were floating in the toilet

bowl. Bushrod used a ram to break the toilet and found in the toilet trap more glassine envelopes marked "Pure Energy."

Detective Joel Domenitz testified that he followed Sergeant Bushrod up the stairs to the second floor apartment, that the officers were yelling "Police" at the same time, and that Sergeant Bushrod banged on the door of the apartment, which was opened by Tito Sanchez. Bushrod was on the left side of the door and Domenitz was on the right when the door was opened. According to Domenitz, Tito immediately tried to close the door and got into a "pushing match" with Bushrod, who then called for the ram. Detective Chin came up with the ram and hit the door, Domenitz having stepped down from the landing to afford Chin a shot at the door. Domenitz indicated that the door never was fully closed, even when it was hit by the ram. He testified that when the door initially was opened, to the extent of a foot or more, he "saw a second male running from what turned out to be the bedroom into the bathroom." There were only two men inside the apartment. Domenitz said that he entered the apartment behind Bushrod, who "grabbed" Tito, and that he handcuffed Carluin after seeing him step out of the bathroom. Domenitz also saw bundles of heroin "swirling" in the toilet bowl and additional bundles in the toilet trap.

After the defense rested, the government called Detective Daniel Chin as a rebuttal witness. It was Detective Chin who used the battering ram to break down the outside door at 417 Thieriot Avenue. He put the ram down near the front door after he entered and watched the field team proceed up the stairs to the second floor. He then heard Sergeant Bushrod call for the ram and immediately picked it up and went to the top of the stairs. Chin testified that he rammed the closed door once in the area of the lock, and that Bushrod and Domenitz were up against the wall at the time. Photographs taken by the owner of the building demonstrate that the force of the ram damaged the door frame in the area of the lock as well as the lock and the door itself. According to Chin's

version of the events, the door opened about six inches after the ram hit it and then slammed shut. There followed a struggle in which Chin and Bushrod pushed on one side of the door and someone on the inside of the apartment pushed on the other side. Sergeant Bushrod was yelling out, "open the door, police," during the struggle. At a point when the door was ajar, Chin observed a person running across the room inside "headed left to right towards the bathroom."

Found in the bathroom closet were approximately 480 glassine envelopes of heroin stamped with the logo "Pure Energy," a 9 millimeter semi-automatic handgun with a clip, and a beeper. In a shopping bag near the bed, the officers found approximately $46,000 in cash.

The inconsistency in the testimony of the three officers regarding the events surrounding their entry into the second floor apartment and the arrest of Carluin Sanchez impelled the district court, in granting a new trial despite the jury verdict of guilty, to label the testimony of all three as perjured:

> The question of whether or not the door was battered down or whether or not Mr. Sanchez opened the door and then tried to close it in Sergeant Bushrod's face was critical to the police officers' testimony that they were able to observe this defendant running from the bedroom to the bathroom where they claim heroin was being flushed down the toilet. So that this does not involve a collateral matter; it involves a matter central to the government's case. In these circumstances I think it entirely appropriate, having concluded that that testimony is perjurious, that the Court grant a new trial.
>
> Frankly, on the record before the Court, the Court could not find, certainly beyond a reasonable doubt, that anything the police officers testified occurred in that apartment did in fact occur. Their whole scenario is undermined when it becomes clear that perjured testimony was offered with respect to how the officers gained entrance to the apartment.

■ The damaging and independent testimony given by Carlos Trinidad was impeached by evidence of serious drug abuse, auditory hallucinations, inconsistent statements and the hope of reward for cooperation, all of which was brought to the jury's attention. However, the district court determined that the testimony was valueless because the jury in *another* case apparently had rejected the testimony given by Trinidad in that case:

> With respect to the testimony of Carlos Trinidad as being an independent basis for the jury to make a finding of guilt beyond a reasonable doubt, . . . the testimony of Carlos Trinidad, which the government argued was highly corroborated in the case of U.S. v. Hector Vasquez, was totally rejected by the jury, and I couldn't conclude that any jury would make a finding of any fact beyond a reasonable doubt based on the testimony of Carlos Trinidad.

## DISCUSSION

The court on motion of a defendant may grant a new trial to that defendant if required in the interest of justice. Fed.R.Crim.P. 33. By its terms, Rule 33 confers broad discretion upon a trial court to set aside a jury verdict and order a new trial to avert a perceived miscarriage of justice. In exercising the discretion so conferred, the court is entitled to "weigh the evidence and in so doing evaluate for itself the credibility of the witnesses." *United States v. Lincoln*, 630 F.2d 1313, 1319 (8th Cir.1980). To say that a trial judge cannot make his or her own evaluation of the testimony of a witness in the context of a Rule 33 motion is to ignore the overwhelming weight of authority to the contrary. *See generally* 3 Wright & Miller, *Federal Practice and Procedure* § 553 (1982); 9 Fed.Proc.L.Ed. § 22:990; and cases cited therein. It goes without saying that the evaluation of trial testimony may lead the judge to the conclusion that perjury has been committed.

■ Even in a case where perjury clearly has been identified, however, we have indicated our reluctance to approve the

granting of a new trial unless we can say that the jury probably would have acquitted in the absence of the false testimony. *See United States v. Stofsky,* 527 F.2d 237, 245–46 (2d Cir.1975), *cert. denied,* 429 U.S. 819, 97 S.Ct. 65, 66, 50 L.Ed.2d 80 (1976); *cf. United States v. Wallach,* 935 F.2d 445, 458 (2d Cir.1991) (applying *Stofsky* formulation and concluding that jury probably would have acquitted defendants). It is only in the rare instance where it can be shown that the prosecution knowingly used false testimony that we would apply a less stringent test and permit the granting of new trial where the jury "might" have acquitted absent the perjury. *Stofsky,* 527 F.2d at 246; *see also Sanders v. Sullivan,* 863 F.2d 218, 225–26 (2d Cir.1988). There is nothing whatsoever in the record before us in this case to indicate that the prosecutor knowingly used false testimony to convict Carluin Sanchez.

■ It long has been our rule that trial courts "must defer to the jury's resolution of the weight of the evidence and the credibility of the witnesses." *United States v. LeRoy,* 687 F.2d 610, 616 (2d Cir.1982), *cert. denied,* 459 U.S. 1174, 103 S.Ct. 823, 74 L.Ed.2d 1019 (1983). It is only where exceptional circumstances can be demonstrated that the trial judge may intrude upon the jury function of credibility assessment. *See United States v. Kuzniar,* 881 F.2d 466, 470 (7th Cir.1989). Where testimony is patently incredible or defies physical realities, it may be rejected by the court, despite the jury's evaluation. *See, e.g., Holland v. Allied Structural Steel Co.,* 539 F.2d 476, 483 (5th Cir.1976), *cert. denied,* 429 U.S. 1105, 97 S.Ct. 1136, 51 L.Ed.2d 557 (1977); *Zollman v. Symington Wayne Corp.,* 438 F.2d 28, 31–32 (7th Cir.), *cert. denied,* 404 U.S. 827, 92 S.Ct. 59, 30 L.Ed.2d 55 (1971). But the trial judge's rejection of all or part of the testimony of a witness or witnesses does not automatically entitle a defendant to a new trial. *See*

*United States v. Indelicato,* 611 F.2d 376, 387 (1st Cir.1979). The test is whether "it would be a manifest injustice to let the guilty verdict stand." *United States v. Reed,* 875 F.2d 107, 114 (7th Cir.1989).

■ Manifest injustice cannot be found simply on the basis of the trial judge's determination that certain testimony is untruthful, unless the judge is prepared to answer "no" to the following question: "Am I satisfied that competent, satisfactory and sufficient evidence in this record supports the jury's finding that this defendant is guilty beyond a reasonable doubt?" In making this assessment, the judge must examine the totality of the case. All the facts and circumstances must be taken into account. An objective evaluation is required. There must be a real concern that an innocent person may have been convicted.[2] It is only when it appears that an injustice has been done that there is a need for a new trial "in the interest of justice." Although a trial court has broader discretion to grant a new trial pursuant to Rule 33 than to grant a motion for a judgment of acquittal pursuant to Fed.R.Crim.P. 29, where the truth of the prosecution's evidence must be assumed, *see* 3 Wright & Miller, *supra* § 553, that discretion should be exercised sparingly. *See United States v. Morales,* 902 F.2d 604, 605 (7th Cir.), *opinion amended on other grounds,* 910 F.2d 467 (1990). As in the case of motions for a new trial based on newly discovered evidence, motions for a new trial based on the identification of perjured testimony should be granted only with great caution and in the most extraordinary circumstances. *See United States v. DiPaolo,* 835 F.2d 46, 49 (2d Cir.1987).

■ In view of the foregoing, we think that it was an abuse of discretion for the district judge to grant a new trial in this case. In the first place, it appears to us that the district judge erred in discounting

---

**2.** The trial court erroneously concluded that guilt or innocence was not a factor to be considered: "I think it is a simplistic answer to suggest that because I might even think this defendant guilty that I should delay seeing that he should be at liberty if I feel he is entitled to a new trial, and I feel there is a substantial possibility that at the new trial that he may well be acquitted. *The mere fact of what I may think on the issue of guilt or innocence is to me irrelevant."* (Emphasis supplied)

the testimony of Sergeant Bushrod and Detectives Domenitz and Chin as perjured. While it is true that the testimony of each officer was somewhat different as regards the point in time at which the door to the Sanchez apartment was first opened, whether the battering ram was used on the apartment door and the manner in which the ram was used (if it was applied at all), the testimony was consistent in a number of other respects. All agreed that there was a struggle, with Tito Sanchez pushing on one side of the door and Sergeant Bushrod pushing on the other. All agreed that at some point when the door was partly opened, someone crossed the room inside the apartment. All agreed that the only other person found in the apartment besides Tito was appellant Carluin. And all agreed on what contraband was found and how and where it was found in the apartment.

Differences in recollection alone do not add up to perjury. *United States v. Bortnovsky,* 879 F.2d 30, 33 (2d Cir.1989); *see United States v. Sprayregen,* 577 F.2d 173, 175 (2d Cir.), *cert. denied,* 439 U.S. 979, 99 S.Ct. 563, 58 L.Ed.2d 649 (1978). Under the circumstances of this case, the differences in testimony presented a credibility question for the jury, at most. *See United States v. Miranne,* 688 F.2d 980, 989 (5th Cir.1982), *cert. denied,* 459 U.S. 1109, 103 S.Ct. 736, 74 L.Ed.2d 959 (1983). The inconsistencies discerned by the trial judge formed an insufficient basis for disturbing the jury's evaluations of credibility. Simply put, the trial judge was wrong to reject all the testimony of the three officers as perjured because of insignificant discrepancies and thereby to overrule the findings of the jury regarding credibility. *See United States v. Muskovsky,* 863 F.2d 1319, 1322–24 (7th Cir.1988), *cert. denied,* 489 U.S. 1067, 109 S.Ct. 1345, 103 L.Ed.2d 813 (1989).

In the second place, assuming that the testimony of all three police officers should be rejected *in toto* as perjured, a new trial still would not be warranted in this case. This is so because it could not be said that the jury probably would have acquitted in the absence of the false testimony. The detailed testimony of Carlos Trinidad alone formed a sufficient foundation for the conviction of Carluin Sanchez. The district court discounted that testimony as an independent basis for conviction because a jury in *another case (United States v. Hector Vasquez)* "totally rejected" Trinidad's testimony. It was only because of the outcome of the *Vasquez* case that the district judge "couldn't conclude that any jury would make a finding of any fact beyond a reasonable doubt based on the testimony of Carlos Trinidad."

Whatever the jury's finding in the *Vasquez* case, it formed an improper basis for the rejection of the Trinidad testimony in this case. The court apparently made no independent evaluation of what Trinidad had to say with regard to Carluin Sanchez as it did with respect to the testimony of the three police officers. In any event, it appears that the jury in this case accepted the testimony of Trinidad, despite the fact that extensive evidence was introduced to impeach his testimony. Moreover, there was substantial corroboration for Trinidad's testimony in the form of physical and electronic surveillance. In two intercepted telephone conversations, Carluin Sanchez is identified by his brother Tito as a participant in the heroin conspiracy. Moreover, contrary to the contention of appellee, the photographic evidence of damage to the apartment door did not contradict all of the testimony of all of the officers. It was at least consistent with the testimony of Detective Chin. It surely cannot be said in this case that the evidence "preponderate[s] heavily against the verdict, such that it would be a miscarriage of justice to let the verdict stand." *United States v. Martinez,* 763 F.2d 1297, 1313 (11th Cir.1985). Nor can it be said that the jury probably would have acquitted in the absence of that portion of the testimony of the officers appellee now claims is false.

Carluin's reliance on *United States v. Weinstein,* 452 F.2d 704 (2d Cir.1971), *cert. denied,* 406 U.S. 917, 92 S.Ct. 1766, 32 L.Ed.2d 116 (1972), for the proposition that a new trial can be ordered on the basis of an assessment of witness credibility with-

out more is misplaced. In *Weinstein,* we vacated a district court's order dismissing an indictment after the entry of a judgment of conviction. Carluin finds the following language in our opinion in that case significant: "We have no doubt that ... the judge had power to grant a new trial if he thought, in the language of the Rule, that this was 'required in the interest of justice' even though, in his phrase, 'no specific error' warranted this." *Id.* at 714. Although we left the district court "free to act" on a motion for a new trial in *Weinstein, id.* at 716, the language quoted merely stated the obvious: that a new trial could be granted upon a proper showing in the district court. We did not suggest in that case the proper standard to be applied or whether a new trial was appropriate on the facts. We certainly did not say that a district judge could grant a new trial solely because of a disagreement with the jury's credibility assessment. Because Carluin thinks we did say that, he is in this case "partly in the right" (in asserting that a judge may make a separate credibility assessment) and also "in the wrong" (in failing to recognize the need to find manifest injustice and a probable acquittal).

## CONCLUSION

The order of the district court setting aside the jury verdict of guilty and granting a new trial is reversed. The jury verdict is reinstated, and judgment shall be entered thereon.