**UNITED STATES of America**

v.

**Francis X. LIVOTI, Defendant.**

**No. 98 CR. 25(SAS).**

United States District Court,
S.D. New York.

Sept. 15, 1998.

Mark F. Pomerantz, Andrew S. Dember, Serene K. Nakano, United States Attorney's Office, New York, New York, for United States.

Stuart London, London & London, White Plains, New York, for Defendant Livoti.

## OPINION AND ORDER

SCHEINDLIN, District Judge.

On June 26, 1998, following a two-week jury trial, Defendant Francis X. Livoti was convicted of violating the civil rights of Anthony Baez, in violation of Title 18, United States Code, Section 242. Livoti now moves for a judgment of acquittal pursuant to Fed. R.Crim.P. 29, or in the alternative, for a new trial, pursuant to Fed.R.Crim.P. 33. For the reasons stated below, Livoti's motions are denied.

### I. Rule 29 Motion for Acquittal

Livoti moves for a judgment of acquittal pursuant to Rule 29 "on the grounds that a reasonable jury must conclude that a reasonable doubt exists as to whether three of the elements of the offense with which Livoti was charged, 18 U.S.C. § 242, have been proven." Defendant's Memorandum of Law in Support of Motion for Acquittal and Alternative Motion for New Trial ("Def.'s Mem.") at 1. Specifically, he contends that a reasonable doubt exists as to whether he (1) used unreasonable force under color of law; (2) "willfully" and with "specific intent" deprived Anthony Baez of his constitutional rights by using unreasonable force; and (3) engaged in conduct which resulted in bodily injury to Anthony Baez. *Id.* at 17.

Rule 29 provides that "[t]he court on motion of a defendant ... shall order the entry of judgment of acquittal of one or more offenses charged in the indictment ... after the evidence on either side is closed if the evidence is insufficient to sustain a conviction of such offense or offenses." Fed.R.Crim.P.

29(a). In *United States v. Martinez*, 54 F.3d 1040 (2d Cir.1995), the court explained the standard of review on such a motion:

[A] defendant seeking to overturn a conviction based upon insufficiency of the evidence bears a "heavy burden." Not only must the evidence be viewed in the light most favorable to the government and all permissible inferences drawn in its favor, but if the evidence, thus construed, suffices to convince any rational trier of fact of the defendant's guilt beyond a reasonable doubt, then [the defendant's] conviction must stand. The government's case need not "exclude every possible hypothesis of innocence," and it is the task of the jury, not the court to choose among competing inferences.

*Id.* at 1042–43 (citations omitted).

At trial, four members of the Baez family testified that they saw Livoti restrain Anthony Baez in a chokehold on the morning of December 22, 1994. Tr. at 93–96, 102–04, 105, 223–25, 327–28, 412–13. According to the testimony of family members and police officers, Anthony Baez was then lowered to the ground, where he remained motionless until he was carried by four police officers to a patrol car and taken to Union Hospital. Tr. at 111–14, 116–19, 230–32, 234, 334–35, 338–339, 414–416, 472–74, 478, 480, 915–917, 1290–95, 1320–22, 1326–29. After arriving at the hospital, Anthony Baez's father told Dr. Kim Jaggers, an emergency room physician, that his son had been choked. Tr. at 418, 482–83, 526. Dr. Charles Hirsch, the Chief Medical Examiner of the City of New York, testified that the cause of Anthony Baez's death was asphyxiation due to neck and chest compression, Tr. at 637, and that, in his opinion, the neck compression was caused by a chokehold which lasted for at least one minute. Tr. at 627–28, 640–42.

Based on this evidence, a rational juror could have concluded beyond a reasonable doubt that Livoti used excessive force by choking Anthony Baez for a sufficiently long time to render him unconscious. A rational juror could also have determined beyond a reasonable doubt that Livoti's actions were willful based on his prolonged application of a chokehold—a restraining technique that he knew was prohibited by the New York City Police Department in all situations. Livoti's suggestion that Anthony Baez's injuries could have been caused by some form of contact other than a chokehold, while possible, was rejected by the jury and is inconsistent with at least some of the evidence presented at trial.

Livoti nevertheless argues that the jury should not have believed the testimony of the Baez family members because they did not mention a chokehold to investigating authorities shortly after Anthony Baez's death, their testimony was inconsistent with prior statements, and they could not have seen what occurred between Livoti and Anthony Baez. Df.'s Mem. at 6–11. Livoti's challenge to the credibility of these witnesses is unavailing. Construing the evidence in the light most favorable to the Government, a rational juror could have credited the Baez family members' testimony, which was corroborated by the testimony of Dr. Jaggers and Dr. Hirsch. Furthermore, the jury's decision to disbelieve defendant's eye-witnesses was reasonable, given the myriad contradictions between their accounts and the testimony of the police officers who were called as government rebuttal witnesses.

Accordingly, a rational juror could conclude beyond a reasonable doubt that the evidence presented at trial satisfied the elements of the charged offense. Defendant's motion for an acquittal is therefore denied.

## II. Rule 33 Motion to Set Aside the Verdict

In the alternative, Livoti moves pursuant to Rule 33 for a new trial in the interest of justice. In support of this motion, Livoti contends that "the weight of the evidence, when considered in light of the credibility of the witnesses, warrants a new trial to avoid a miscarriage of justice." Def.'s Mem. at 1. Livoti also moves for a new trial on the basis of various alleged evidentiary errors.

### A. *Challenge to the Sufficiency of the Evidence*

Rule 33 confers broad discretion upon a trial court to set aside a jury verdict

and order a new trial to avert a perceived miscarriage of justice. *See United States v. Sanchez,* 969 F.2d 1409, 1413 (2d Cir.1992). In exercising this discretion, the court "is entitled to weigh the evidence and in doing so evaluate for itself the credibility of the witnesses." *Id.* (internal quotations omitted). However, the trial court may intrude upon the jury's function of assessing the credibility of witnesses only in such "exceptional circumstances" as where the testimony is "patently incredible or defies physical realities." *Id.* at 1414.

In light of the facts set forth above in the discussion of Livoti's Rule 29 motion, it is apparent that this case does not present any exceptional circumstances warranting a rejection of the jury's credibility assessments. Thus, to the extent that Livoti's Rule 33 motion concerns the sufficiency of the evidence presented at trial, the motion is denied. I now turn to Livoti's arguments concerning the Court's alleged evidentiary errors.

### B. *Alleged Evidentiary Errors*
#### 1. *Rule 404(b) Evidence*

First, Livoti claims that the Court erred in admitting evidence that he had assaulted Steven Resto on September 11, 1993. For the reasons set forth in *United States v. Livoti,* 8 F.Supp.2d 250, 1998 WL 289637 (S.D.N.Y. 1998), this evidence was properly admitted pursuant to Fed.R.Evid. 404(b).

#### 2. *Restriction on Resto Cross–Examination*

Second, Livoti contends that the Court improperly restricted his questioning of Steven Resto when it limited cross-examination about Resto's testimony as a defense alibi witness in an unrelated homicide case prosecuted by the Bronx District Attorney. Livoti argues that because the defendant in the Bronx homicide was convicted, the jury in that case did not believe Resto's testimony— a fact which should have been made available to the jury in this case. *See* Def.'s Mem. at 18.

At trial, the Court permitted Livoti to ask Resto (1) whether he had been a witness on any prior occasions; (2) at which case he had

been a witness; (3) whether he was an alibi witness in a murder case; and (4) whether there was a conviction in that case. Tr. at 577–78. Resto testified on cross-examination that in October 1996, he had testified as an alibi witness on behalf of a friend who was charged with homicide in Bronx County, and that his friend was convicted. *Id.* at 581. In summation, Livoti argued that Resto was not credible, in part, because he had testified as an alibi witness for a friend who was convicted. *Id.* at 1454. Thus, despite his contention to the contrary, Livoti was permitted to disclose to the jury Resto's prior testimony as an alibi witness.

Moreover, even if the Court somehow erred in not permitting Livoti to elicit additional details concerning Resto's testimony as an alibi witness, that error was harmless. Further examination concerning Resto's testimony in an unrelated case would not have affected the jury's assessment of his credibility. Accordingly, the second evidentiary error alleged by Livoti does not warrant a new trial.

#### 3. *Cross–Examination Concerning Orders Given to Sergeant Monahan*

■ Third, Livoti claims that the Court erred in allowing the Government to cross-examine Sergeant Monahan about the orders he received from his commanding officer to monitor Livoti while on duty. Livoti contends that the cross-examination "resulted in cumulative evidence" which should have been excluded under Fed.R.Evid. 403, because the jury had already been read a stipulation which provided that Livoti had been "individually warned by the commander of the 46th Precinct to refrain from using excessive force and to avoid unnecessary civilian confrontations." *See* Def.'s Mem. at 19.

Monahan's testimony was not cumulative. The stipulation entered into between Livoti and the Government was offered in lieu of testimony from a number of Livoti's commanding officers who had directed him at various times to refrain from unnecessary civilian confrontations and to avoid the use of excessive force. *See* Transcript of June 9, 1998 Pre–Trial Hearing at 114–23; Tr. at 811–14. Monahan's testimony concerned orders which were given to him, rather than to

Livoti. This evidence was probative of Monahan's motive to lie concerning Livoti's conduct on December 22, 1994, because despite the orders of his commanding officer, Monahan did not supervise Livoti's conduct during or after defendant's encounter with the Baez family. Tr. 806–11, 815–16. Monahan's testimony concerning the orders which he had received was therefore properly admitted.

### 4. *Cross–Examination Concerning the Officers' Immunity Demands*

 Fourth, Livoti claims that the Court erred in allowing the Government to cross-examine Officers Farnan and Erotokritou and Sergeant Monahan about whether they had requested immunity in grand jury proceedings or invoked their Fifth Amendment privilege against self-incrimination. *See* Def.'s Mem. at 19. He claims that the purpose of this evidence "was to lead the jury to infer that all the police officers involved in this incident, including Livoti, were guilty because they had sought immunity and/or would not testify," and that this questioning "was an indirect way of commenting that Livoti was exercising his 5th Amendment privilege." *Id.* at 19–20.

Livoti failed to object to the questioning of Officers Farnan and Erotokritou when they were questioned about their demand for immunity at prior proceedings. Tr. at 960–61, 1231. With respect to the testimony of Sergeant Monahan, Livoti objected to only two questions concerning whether Monahan had demanded immunity before agreeing to speak to police department investigators and before agreeing to testify before the grand jury. Tr. at 924, 927. Livoti, however, did not articulate the basis for his objections. Nor did he make a motion to strike any of the officers' testimony or seek a limiting or curative instruction from the Court. Livoti has therefore failed to preserve this issue for further review. *See United States v. Walker,* 142 F.3d 103, 109 (2d Cir.1998); *United States v. Daly,* 842 F.2d 1380, 1387 (2d Cir. 1988); Fed.R.Evid. 103(a)(1).

Moreover, contrary to Livoti's claim, the Government never questioned Monahan about invoking the Fifth Amendment privilege against self-incrimination. Rather, the Government questioned Monahan only about his demand for immunity before agreeing to testify at prior proceedings. Tr. 924, 927. Such a grant of immunity was relevant to the jury's evaluation of the witness' credibility. *See United States v. Lawrence,* 934 F.2d 868, 873 (7th Cir.1991); *United States v. McNeill,* 728 F.2d 5, 14 (1st Cir.1984). Accordingly, the fact that Monahan was cross-examined about his prior demands for immunity was not error.

### 5. *The Court's Questioning of Officer Boria*

Finally, Livoti claims that the Court erred in questioning Officer Boria about the reason she had problems with her partner, Officer Erotokritou, after December 22, 1994. Livoti contends that the Court's questions indicated to the jury "the way the judge [was] leaning" and improperly "sway[ed] the jury in their deliberations." Def.'s Mem. at 20.

 "[A] trial judge's role is not that of umpire or referee.... In its participation at trial, a district court should ask those questions necessary for such purposes as 'clarifying ambiguities, correcting misstatements, or obtaining information needed to make rulings.'" *United States v. Filani,* 74 F.3d 378, 386 (2d Cir.1996) (citations omitted); *see also United States v. Mazzilli,* 848 F.2d 384, 388 (2d Cir.1988). "Fundamental to the right to a fair trial, however, is that the court's responsibility to assist the jury in understanding the evidence should not be so zealously pursued as to give the impression to the jury that the judge believes one version of the evidence and disbelieves or doubts another." *Id.; see also United States v. Victoria,* 837 F.2d 50, 55 (2d Cir.1988). Measured against these standards, the Court's questioning of Officer Boria was proper.

 The Government initially asked Officer Boria whether the reason she started having a problem with Officer Erotokritou after the Baez incident was because she did not back him up. Tr. at 1354. Livoti then objected to the question, without articulating the basis for the objection. *Id.* The Court

sustained the objection as to form and then asked Officer Boria what her understanding was as to the reason she started having a problem with Officer Erotokritou. *Id.* Livoti did not object to the Court's question. Officer Boria responded somewhat cryptically, stating that "[i]t had to do because I wouldn't go along with what they wanted me to go along with." *Id.* Seeking to clarify this answer, the Court asked Officer Boria whether "this case" was the source of her problems with Officer Erotokritou, and the witness answered, "yes." *Id.* Again, Livoti did not object to the Court's question. The Court then restricted the Government's questioning of Officer Boria concerning her conversations with Officer Erotokritou. *Id.* at 1355–1360.

The Court's sole purpose in asking the two questions of Officer Boria was to assist the jury in understanding the evidence. Nothing in the Court's questioning of Officer Boria could have given the jury the impression that the Court believed Officer Boria's version of the events in question or the Government's case. The Court's questioning of the witness was therefore appropriate and in no way encroached on Livoti's right to a fair trial. Accordingly, Livoti has not identified any erroneous evidentiary rulings, nor any circumstances that would constitute a "miscarriage of justice."

### III. Conclusion

For the aforementioned reasons, Livoti's motion for a judgment of acquittal pursuant to Rule 29 and motion for a new trial pursuant to Rule 33 are denied.